UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREATER PENNSYLVANIA CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| PHILIP MORRIS INTERNATIONAL INC., ANDRÉ CALANTZOPOULOS, MARTIN G. KING and JACEK OLCZAK, | DEMAND FOR JURY TRIAL |
| Defendants. | |

**INTRODUCTION**

Plaintiff Greater Pennsylvania Carpenters' Pension Fund ("GPCPF" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by Philip Morris International Inc. ("Philip Morris" or the "Company"), Philip Morris' filings with the U.S. Securities and Exchange Commission ("SEC"), and media and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## SUMMARY OF THE ACTION

1.       This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Philip Morris common stock between July 26, 2016 and April 18, 2018, inclusive (the "Class Period"). The action is brought against Philip Morris and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.       Philip Morris is one of the largest and most recognizable cigarette and tobacco manufacturing companies in the world. The Company's subsidiaries and affiliates and their licensees are engaged in the manufacture and sale of cigarettes and other nicotine-containing products in markets outside of the United States.  To combat stagnant or negative sales trends due to declining smoking percentages worldwide, the Company has in recent years been engaged in the development and commercialization of smoke-free alternatives to cigarettes. These products, known as reduced-risk products ("RRPs") are touted as less risky to smokers who switch from cigarettes.

3.       The Company's leading RRP brand IQOS, first introduced in Japan in 2014, is a controlled device into which a specially designed heated tobacco unit (known as HEETS) is inserted and heated to generate an aerosol.  Following the initial roll-out of IQOS into Japanese markets, Philip Morris sought to replicate the IQOS growth and expand its consumer base worldwide.  As a key part of this expansion strategy, in December 2016, the Company submitted to the U.S. Food and Drug Administration ("FDA") a Modified Risk Tobacco Product ("MRTPA") for IQOS and a Premarket Tobacco Product Application ("PMTA") in March 2017 – with the Company hoping to capture roughly 6 million (or 15 percent) of American smokers over the years with an FDA approval.

4.      During the Class Period, Defendants emphasized a "wide array of benefits" of heat-not-burn products such as IQOS – including the "potential to reduce the risk of smoking-related diseases" and less harmful than cigarettes. However, Defendants' (as defined herein) statements were materially false and misleading because Defendants failed to disclose that there were irregularities in the clinical experiments underpinning Philip Morris' applications to the FDA for IQOS in the United States.

5.      On December 20, 2017, *Reuters* released a comprehensive investigative report detailing irregularities in the clinical trials underpinning the Company's FDA application for IQOS in the United States. The *Reuters* report highlighted deficiencies within the clinical trials, such as shortcomings in the training and professionalism of the lead investigators – *i.e.* lack of English skills from researchers, failure to follow basic procedure to obtain informed consent, and uninformed and unsophisticated investigators, among other concerns.

6.      On this news, the Company's stock price fell $3.75 per share or approximately 3.5 percent, to close at $104.37 per share on December 20, 2017, damaging investors.

7.      Then, on January 25, 2018, *The New York Times* published an article entitled "F.D.A. Panel Rejects Philip Morris' Claim That Tobacco Stick Is Safer Than Cigarettes," reporting the FDA's Tobacco Products Scientific Advisory Committee had recommended for the rejection of Philip Morris' bid to market IQOS as safer than traditional cigarettes in the United States.  According to the article, the Committee questioned the quality of the science behind the company's safety claims, and in an eight-to-one vote, the "panel rejected the company's contention that 'scientific studies have shown that switching completely from cigarettes to the IQOS system can reduce the risks of tobacco-related diseases.'" The panel "also expressed doubt

that smokers would completely switch to use of the stick, saying many might become long-term dual users of the device and traditional cigarettes."

8.    On this news, the Company's stock price fell $3.11 per share or 2.81 percent, to close at $107.49 on January 25, 2018.

9.    Concurrent with the FDA application for marketing IQOS in the United States, the Company was experiencing negative sales trends due to declining smoking percentages worldwide. During this period, Defendants were reassuring investors that these negative sales trends were being successfully offset by new sales initiatives and touted steady growth in the RRP market, mainly attributed to the success of IQOS.  However, Defendants' statements were materially false and/or misleading when made because Defendants failed to disclose (i) that Philip Morris was experiencing a faster decline in overall cigarette and e-cigarette (or "heated tobacco") sales volumes than investors had been led to believe, (ii) that its much-lauded sales initiatives had stalled, and (iii) that it was experiencing adverse sales headwinds in key markets. As a result of these misrepresentations, Philip Morris stock traded at artificially inflated price levels throughout the Class Period.

10.    On April 19, 2018, Philip Morris issued a press release announcing disappointing results for the Company's first quarter of 2018. Against its easiest prior-year comparison, the Company reported that combined cigarette and heated tobacco unit shipment volume had declined by 2.3% during the quarter. The Company also stated that key sales initiatives had stalled, as the Company's heated tobacco unit growth had plateaued due to market demographics and faltering consumer conversion tactics and, further, that cigarette shipments had fallen by 5.3% during the quarter, signaling persistent adverse trends in the business.

11.     On this news, the Company's stock price fell $15.80 per share, or more than 15 percent, to close at $85.64 per share on April 19, 2018. This represented the worst daily decline for the Company in nearly a decade.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.   Philip Morris' principal executive offices are headquartered within this District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiff GPCPF purchased Philip Morris common stock during the Class Period, as set forth in the certification attached hereto, and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

18.     Defendant Philip Morris is a Virginia corporation with its principal executive offices located at 120 Park Avenue, New York, New York 10017.  The Company's stock is listed on the NYSE under the ticker symbol "PM."

19.     Defendant André Calantzopoulos ("Calantzopoulos") has served as the Chief Executive Officer ("CEO") of Philip Morris since May 8, 2013, and served as its Chief Operating Officer ("COO") from March 28, 2008 to May 8, 2013.

20.     Defendant Martin G. King ("King") has served as the Chief Financial Officer ("CFO") of Philip Morris since January 1, 2018.

21.     Defendant Jacek Olczak ("Olczak") has served as the COO of Philip Morris since January 1, 2018, and served as its CFO from August 1, 2012 to December 31, 2017.

22.     Defendants are Calantzopoulos, King and Olczak collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Philip Morris' reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that

the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

23.    Philip Morris and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24.    Incorporated in 1987, Philip Morris is a holding company engaged, through its subsidiaries and affiliates, in the manufacture and sale of cigarettes, other tobacco products and other nicotine-containing products outside the United States. In 2008, the Company was spun off from operating company Altria Group, Inc., which focuses on the sale of tobacco products inside the United States. Marlboro is the Company's most recognized and best-selling product.

25.    Large tobacco manufacturers have been under the threat of declining sales volumes for years, as the number of smokers has decreased globally, offset somewhat by population growth. Companies have been able to push through price increases to make up for falling volumes in order to sustain revenues and profits. In addition, companies such as Philip Morris have branched out into alternative smokeless products to increase sales volumes and market share. Using these strategies, Philip Morris was able to increase annual net revenues from $73.9 billion in fiscal 2015 to $78.1 billion in fiscal 2017, an increase of over 5%.

26.    Philip Morris has two main categories of tobacco products: (i) cigarettes; and (ii) heated tobacco units. The vast majority of the Company's sales derive from cigarettes, which include the Company's well-known and traditional brands such as Marlboro. Heated tobacco units were only recently introduced by the Company. The Company's tobacco heating system,

IQOS, are sophisticated electronics that heat specially designed heated tobacco units – heating tobacco just enough to release a flavorful nicotine-containing vapor without combustion, fire, ash or smoke.  IQOS contains three main components – a heated tobacco unit (called HEETS or HeatSticks), an IQOS holder and a charger.

27.    Between 2016 and 2017, the Company's total cigarette shipment volumes decreased from about 812.9 billion units to about 761.9 billion units. During this same time, sales of the Company's heated tobacco products increased from about 7.4 billion units to over 36.2 billion units. Thus, it was critically important to investors and the Company's long-term prospects that Philip Morris stem the tide of lower cigarette sales volumes and continue to increase its heated tobacco unit sales volumes.  As part of its long-term strategy, Philip Morris sought to expand its customer base by introducing IQOS to several markets, including the United States.

28.    Thus, in December 2016, the Company submitted to the FDA a MRTPA for IQOS, and a PMTA in March 2017.  In May 2017, the FDA formally accepted and filed the Company's MRTPA for substantive scientific review, and by August 2017, the FDA completed a preliminary review of the Company's PMTA and accepted its application for substantive review. By way of background, the MRTPA governs whether IQOS can be marketed in the United States as either a modified exposure, or a modified risk product, while the PMTA, if approved, would allow IQOS to be marketed in the United States without claims.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

**The Company's FDA Applications Are Not Supported by Proper Scientific Data**

29.    The Class Period begins on July 26, 2016, when Philip Morris filed its Quarterly Report on Form 10-Q with the SEC for the quarter ended June 30, 2016 (the "2Q16 Form 10-

Q"). In the 2Q16 Form 10-Q, the Company stated that its "approach and the studies conducted

to date reflect the rigorous evidentiary package contemplated in the FDA's Draft Guidance for

Modified Risk Tobacco Product Applications (2012)," stating in relevant part:

> Our RRPs are in various stages of development and commercialization, and we
> are conducting extensive and rigorous scientific studies to determine whether we
> can support claims for such products of reduced exposure to harmful and
> potentially harmful constituents in smoke and, ultimately, claims of reduced
> disease risk when compared to smoking cigarettes. Before making any such
> claims, we will rigorously evaluate the full set of data from the relevant scientific
> studies to determine whether they substantiate reduced exposure or risk. Any
> such claims may also be subject to government review and authorization, as is the
> case in certain markets today. We draw upon a team of world-class scientists and
> engineers from a broad spectrum of scientific disciplines, and our efforts are
> guided by the following three key objectives:
>
>   • to develop RRPs that provide adult smokers the taste, sensory experience,
>     nicotine delivery profile and ritual characteristics that are similar to those
>     currently provided by cigarettes;
>
>   • to substantiate the reduction of risk for the individual adult smoker and the
>     reduction of harm to the population as a whole, based on robust scientific
>     evidence derived from well-established assessment processes; and
>
>   • to advocate for the development of science-based regulatory frameworks
>     for the development and commercialization of RRPs, including the
>     communication to adult smokers of scientifically substantiated reduced
>     exposure or reduced risk claims.
>
> ***
>
> In the United States of America, an established regulatory framework for
> assessing "Modified Risk Tobacco Products" exists under the jurisdiction of the
> Food and Drug Administration ("FDA") by virtue of a 2009 statute. We expect
> that future FDA actions are likely to influence the regulatory approach of other
> interested governments. Our assessment approach and the studies conducted to
> date reflect the rigorous evidentiary package contemplated in the FDA's Draft
> Guidance for Modified Risk Tobacco Product Applications (2012). We have
> shared our approach and studies with the FDA's Center for Tobacco Products.

Defendant Olczak signed the 2Q16 Form 10-Q and certified that it was accurate, not misleading

and free from fraud.

9

30.     On September 29, 2016, during Philip Morris' Investor Day call with analysts and investors, Philip Morris' Chief Scientific Officer for Reduced-Risk Products, Manuel C. Peitsch, reiterated that the Company's approach follows FDA guidelines and made positive statements about benefits of its IQOS product, stating in relevant part:

> [W]e follow a multi-step research program that starts with aerosol characterization of the product, progresses to clinical studies, and tracks the impact of the product in the real world after its launch in the marketplace. At each step, we demonstrate a key component of the risk reduction potential of our Reduced-Risk Product before proceeding to the next step. Our assessment is aligned with the U.S. FDA's Draft Guidance for Modified Risk Tobacco Products and it is described in a recent peer-reviewed article published in Regulatory Toxicology and Pharmacology available online at PMIScience.com.
>
> ***
>
> In summary, the scientific research conducted across a range of studies demonstrates that IQOS has a wide array of benefits compared to smoking cigarettes. We have focused on the health effects of the product and its potential to reduce risk, on the product's environmental impact including odor and indoor air quality, and on short-term benefits such as oral hygiene. In each of these categories, we have substantiated important adult consumer messages.
>
> Most importantly, the totality of the evidence generated to-date supports our conclusion that IQOS has the potential to reduce the risk of smoking-related diseases in adult smokers who switch to it completely.

31.     On February 14, 2017, Philip Morris filed its Annual Report on Form 10-K with the SEC ("2016 Form 10-K"). The 2016 form 10-K discussed IQOS, stating in relevant part:

> We have a range of RRPs in various stages of development, scientific assessment and commercialization. We conduct rigorous scientific assessment of our RRP platforms to establish that they reduce exposure to harmful and potentially harmful constituents in smoke and, ultimately, that these products present, are likely to present, or have the potential to present less risk of harm to adult smokers who switch to them versus continued smoking. We draw upon a team of expert scientists and engineers from a broad spectrum of scientific disciplines and our extensive learnings of consumer preferences to develop and assess our RRPs. Our efforts are guided by the following key objectives:
>
> - to develop RRPs that adult smokers who would otherwise continue to smoke find to be satisfying alternatives to smoking;

- for those adult smokers, our goal is to offer RRPs with a scientifically substantiated risk reduction profile that approaches as closely as possible that associated with smoking cessation;

- to substantiate the reduction of risk for the individual adult smoker and the reduction of harm to the population as a whole, based on scientific evidence of the highest standard that is made available for scrutiny and review by external independent scientists and relevant regulatory bodies; and

- to advocate for the development of science-based regulatory frameworks for the development and commercialization of RRPs, including the communication of scientifically substantiated information to enable adult consumers to make better health choices.

Defendants Calantzopoulos and Olczak signed the 2016 Form 10-K and certified that it was accurate, not misleading and free from fraud.

32.    The statements contained in ¶¶ 29-31 were materially false and/or misleading when made because Defendants failed to disclose that: (i) there were irregularities in the clinical experiments underpinning Philip Morris' FDA application to market IQOS in the United States; and (ii) the Company's positive statements about its business, operations, and prospects lacked a reasonable basis.

33.    On December 20, 2017, *Reuters* released a comprehensive investigative report detailing irregularities in the clinical trials underpinning the Company's application to the FDA for approval of its IQOS smoking device in the United States.  According to *Reuters*, former employees and contractors described "a number of irregularities involving [the] clinical trials," including uninformed investigators who failed to follow "basic procedure for obtaining informed consent," "urine samples that exceeded what a human being is capable of," shortcomings in the training and professionalism of lead investigators and their knowledge of the study results.  The honesty of study participants and the inability of researchers to speak English well were also concerns highlighted in the report. Tamara Koval, the co-author of the company's protocol used

to the run the studies globally, raised concerns internally, and was rebuffed and excluded from meetings as a result.

34.    On this news, the Company's stock price fell $3.75 per share or approximately 3.5 percent to close at $104.37 per share on December 20, 2017, damaging investors.

35.    Then, on January 25, 2018, *The New York Times* published an article entitled "F.D.A. Panel Rejects Philip Morris' Claim That Tobacco Stick Is Safer Than Cigarettes," reporting the FDA's Tobacco Products Scientific Advisory Committee had recommended for the rejection of Philip Morris' bid to market IQOS as safer than traditional cigarettes in the United States.  According to the article, the Committee questioned the quality of the science behind the company's safety claims, and in an eight-to-one vote, the "panel rejected the company's contention that 'scientific studies have shown that switching completely from cigarettes to the IQOS system can reduce the risks of tobacco-related diseases.'" The panel "also expressed doubt that smokers would completely switch to use of the stick, saying many might become long-term dual users of the device and traditional cigarettes."

36.    On this news, the Company's stock price fell $3.11 per share or 2.81 percent, to close at $107.49 on January 25, 2018.

**Negative Sales Trends Were Not Offset by IQOS**

37.    On September 29, 2016, during Philip Morris' Investor Day call with analysts and investors, Defendant Calantzopoulos made positive statements about the success and potential market growth for RRPs, which includes IQOS, stating in relevant part:

> When I spoke to you just over two years ago at our last Investor Day, we had yet to launch the first city-wide test of our RRPs. Today, we have already converted almost 1 million adult smokers to our RRPs. We are more confident than ever that these products have the potential to fundamentally transform our business. From a

financial perspective, ***we expect RRPs to become accretive to our bottom line in 2018 and enhance our growth algorithm thereafter.***[1]

Philip Morris' President of Reduced-Risk Products, Miroslaw Zielinski then added:

> [W]e expect RRP volume to reach 3% to 5% of the markets in scope by 2020 and to be profitable as of 2018. ***With the observed in market performance of IQOS to-date, we are even more confident today that we will meet or exceed these targets.***
>
> Our goal is to lead a full-scale effort to ensure that Reduced-Risk Products ultimately replace cigarettes to the benefit of adult smokers, society, our company and our shareholders. Our business model is very clear and holds great promise for our shareholders: to become the undisputed leader in Reduced-Risk Products.

38.     During the same Investor Day call, Philip Morris' Zielinski also discussed favorable growth trends relating to IQOS and highlighted the Company's purported success in converting Japan's existing adult population to heated tobacco products, stating in pertinent part:

> We continue to optimize launch plans and related investments, continually increasing our effectiveness of converting adult smokers to IQOS. IQOS device penetration is improving across all launch geographies, illustrating the ***strong adult smoker interest in the category***. Indeed, our sales of IQOS in Japan over the last 12 months have reached an accumulated 2 million devices sold, equivalent to 9.5% of the adult smoker population. Similarly, we observe strong trends of IQOS device sales in other markets as shown on the slide.
>
> IQOS device sales reflect first device purchases, and adult smoker buying more than one device, in the launch area. The number also reflects device purchased by adult smokers from outside the launch area, but who are interested in the IQOS proposition. This latter group influences HeatStick sales volume only to a very limited extent and until the geographic coverage is expanded.
>
> Due to the stronger than forecasted performance of IQOS in Japan, we experienced supply shortage in June. In spite of this, we are continuing to grow market share as reflected in the graph. Martin will also provide additional comments on the performance of IQOS in Japan as part of his regional update later today.
>
> The commercialization of IQOS continues to progress well across other metrics. We're achieving combined full and predominant conversion levels in line with those in Japan in all other launch markets. Due to the combination of strong IQOS

---

[1] Unless otherwise indicated, all emphasis is added.

purchase performance and adult smoker conversion ratios, we are seeing a solid trend in volume performance across launch markets as summarized in this chart.

39.     During the call, Defendant King made positive statements about the success of IQOS, particularly in Japan, and highlighted the Company's purported success in converting Japan's existing adult population to heated tobacco products, stating in relevant part:

> We believe that IQOS and our other RRPs have the potential to change the future of the tobacco industry. ***Building on our exceptional performance in Japan, we anticipate that IQOS will have a significantly favorable impact on our mid-to long-term results.*** Furthermore, our valuable learnings in Japan will help us succeed as we expand RRP to additional markets in Asia.
>
> The ***steady market share increase of HeatSticks in Japan indicates strong adult smoker demand for RRPs*** and adult consumer appreciation for the unique benefits of IQOS.
>
> ***
>
> The continuous increase of the conversion rate from cigarettes to IQOS is very promising. Based on our most recent data, 73% of the panel users have either fully or predominantly converted to IQOS. This high conversion rate can be attributed to increasing awareness levels among adult smokers through broader media coverage and word of mouth. We have taken proactive steps to raise this awareness through various forms of communications, especially following the national expansion, and we will continue to invest behind IQOS to further enhance adult consumer awareness and trial.

40.     On February 2, 2017, Philip Morris held a conference call with analysts and investors to discuss its financial results and operations for the fiscal year end 2016.  During the call, Defendant Calantzopoulos reiterated positive statements regarding the growth potential of IQOS, stating in relevant part:

> HeatSticks volume reached 7.4 billion units, which reflected our maximum manufacturing capacity for 2016. HeatSticks volume would have been much higher absent this capacity restriction, which obliged us to limit IQOS device sales in Japan since June.
>
> ***
>
> To close on 2016, I will highlight the favorable performance of IQOS across the many launch markets beyond Japan. While this performance requires some additional context given the smaller scale of the launches and the role of

HeatSticks' capacity constraints in the second half of last year, it nonetheless *serves as a positive indicator of the potential for IQOS broadly.*

One measure that we closely monitor is the rate of IQOS purchasers who fully or predominantly convert to the product. Conversion rates have grown over time and at the end of 2016 stood at approximately 70% or higher. As a reminder, Japan only reached this level in May last year, over 18 months after launch. This *confirms that IQOS resonates strongly with adult smokers who try it, irrespective of the market.*

*** 

*IQOS is performing exceptionally,* with its most visible success in Japan, and high conversion rates and off-take volume growth broadly. As of year-end 2016, we estimate that approximately 1.4 million adult consumers have quit smoking cigarettes and converted to IQOS.

41.     On April 20, 2017, Philip Morris held a conference call with analysts and investors to discuss its financial results and operations for the first quarter 2017. During the call, Defendant Olczak reiterated positive statements regarding the growth potential of IQOS, stating in relevant part:

In Japan, the strong performance of IQOS continues to be the primary driver of our result. Market share increased by 5.4 points in the quarter to 30% driven mainly by the growth of Marlboro HeatSticks. Marlboro share including cigarettes and HeatSticks increased by 5.7 points to 17.1%. Industrial volume declined by 7.4% or by 4.3% excluding inventory movement. The strong performance of IQOS in Japan is further evidence by the weekly uptick shares for Marlboro HeatSticks. As seen on this chart, the brand closed the quarter with a weekly uptick share of 9.6% nationally, 11.6% in Tokyo and 14.9% in Sendai. We believe that the strong uptick performance in Sendai in particular clearly *demonstrates the growing potential of the heated tobacco category in Japan*.

42.     On July 20, 2017, Philip Morris held a conference call with analysts and investors to discuss its financial results and operations for the second quarter 2017. In response to an analyst question about competitive launches in other markets and how it would impact IQOS' performance, Defendant Olczak stated:

I mean, IQOS, it is early days. I mean, we'll have to look at the national expansion like here announced by the competitors in Japan. I mean, how it is going to change the dynamics in terms of the growth rates of IQOS. But at this

stage, I think **we feel pretty confident that consumer will - we will continue having a high conversion rate and very importantly higher stickiness rate for our product proposition.**

43.    On October 19, 2017, Philip Morris held a conference call with analysts and investors to discuss its financial results and operations for the third quarter 2017. During the call, Defendant Olczak reiterated positive statements regarding the growth potential of IQOS, stating in relevant part:

> Thanks to the exceptional performance of IQOS, our third quarter net revenues for RRPs reached $947 million and accounted for nearly 30% of our total net revenues. Please keep in mind that the portion of this net revenues are from IQOS devices, which yield a negative margin due to introductory discounts offered in the initial commercialization phase to accelerate adult smoker switching.

> While we remain in the early stages of our transformations to a smoke-free future, the **size of our RRP net revenues confirms the exciting progress that we are already making** on this journey.

Defendant Olczak later added: "Our retail off-take shares in Japan further highlight the success of IQOS, irrespective of geography and the presence of competitive smoke-free products."

44.    On February 8, 2018, Philip Morris issued a press release announcing its results for the quarter and year ended December 31, 2017 ("FY 2017 Press Release"). The FY 2017 Press Release stated that the Company's net revenues, excluding excise taxes, had increased 7.7% for the year to $28.7 billion, up 9.4% year-over-year excluding unfavorable currency impacts. For the quarter, the FY 2017 Press Release stated that the Company's cigarette and heated tobacco unit shipment volumes had increased by 3.8% to 212.1 billion and its net revenues, excluding excise taxes, had increased by 19% to $8.3 billion. The FY 2017 Press Release also provided a 2018 full-year forecast that projected net revenue growth of over 8%, excluding excise taxes. Defendant Calantzopoulos commented on the results, representing that the Company's strong momentum from its fourth quarter results had carried into the new year

and set a "strong foundation" in traditional cigarette sales and for accelerating growth in heated

tobacco units. The press release stated in pertinent part as follows:

> "A strong fourth-quarter performance helped drive robust full-year results,
> exemplified by currency-neutral, double-digit adjusted earnings per share growth,
> despite previously disclosed challenges in Russia and Saudi Arabia . . . ."

> "The excellent performance of our flagship smoke-free product IQOS –
> not only in Asia, but also in the vast majority of our launch geographies –
> underscored its great promise and the commitment of our employees to lead the
> transformation of our industry towards a smoke-free future. ***Continued
> investment behind IQOS in 2018 is expected to further drive its positive
> momentum.***"

> "For the first time since 2011, we have entered the year with annual guidance that
> reflects a positive currency impact. Our combustible product portfolio provides us
> with a strong foundation. The confirmed potential of our smoke-free alternatives
> reinforces our strong determination to deploy all necessary resources to accelerate
> their growth, which will drive our business success and ability to generously
> reward our shareholders over the long term."

45.     On the same day, Philip Morris held a conference call with analysts and investors

to discuss its financial results and operations. Defendants Calantzopoulos and King participated

on the call, among others. Regarding the improvement in the Company's total sales volume in

the fourth quarter, Defendant Calantzopoulos stated:

> The sequential improvement in our quarterly volume performance
> ***continued in the fourth quarter***, with heated tobacco unit growth driving a total
> shipment volume increase of 3.8% or 1.4%, excluding inventory movements. For
> the year, heated tobacco unit shipment volume nearly quintupled to reach $36.2
> billion.

> The sequential growth in our total international market share, excluding
> China and the U.S., also continued in the fourth quarter. Since the first quarter,
> our quarterly share for heated tobacco units and cigarettes increased by 0.7 and
> 1.1 points, respectively.
>
> \* \* \*
>
> While our total cigarette share declined by 3.7 points last year, ***we
> recorded strong sequential share growth, beginning in the second quarter***. Full
> year cigarette industry volume declined by 5.6%, mainly due to the impact of
> excise tax-driven price increases on lower-priced brand. In fact, volume in the
> Premium segment, which is essentially Marlboro, increased.

46.     During the conference call, Defendant Calantzopoulos highlighted the Company's "spectacular performance" in Japan, which he represented was driven by heated tobacco unit sales, and that "total shipment volume increased by 13.1%" in the country. Defendant Calantzopoulos also stated that Philip Morris expected this demand "*to grow further in the first quarter* following a planned lifting of the restriction on IQOS device sales; the establishment of appropriate distributor inventory levels of heated tobacco units, given the current high dependence on a single manufacturing center; and the transition from air to sea freight of heated tobacco unit shipments, largely completed in the fourth quarter of 2017."

47.     Continuing his prepared remarks, during the conference call, Defendant Calantzopoulos represented that these favorable growth trends were continuing and would drive favorable growth in 2018. He stated the following in pertinent part:

> *In conclusion, our robust business performance in 2017 underscored the enormous promise of reduced-risk products, the enduring strength of our combustible product portfolio and the commitment of our employees to lead the transformation of our industry*. We recorded strong full year currency-neutral adjusted financial results, highlighted by our highest annual net revenue growth, excluding currency and acquisitions, since our spinoff in 2008.
>
> *IQOS is performing exceptionally*, demonstrating the importance of our investments and our ability to transfer and apply learnings across markets.

48.     Later, in response to an analyst question about increased inventory shipments to Japan and the size of the market opportunity there, Defendant Calantzopoulos stated:

> Look, we had to build these inventories for the reasons I explained, so *I don't see this decreasing. If I see anything as the volume goes up, it has to be adjusted, obviously, upwards over time*. . . . The second one is, look, we have our own projection for total market in Japan, including obviously HeatSticks. And *there's nothing in the horizon that would affect – that would cause any change in what happened in the previous years.*

49.    On February 13, 2018, Philip Morris filed its Annual Report on Form 10-K with the SEC ("2017 Form 10-K"). The 2017 Form 10-K repeated and restated the annual and quarterly financial results and outlook of "over 8.0%" net revenue growth provided in the FY 2017 Press Release. In addition, the 2017 Form 10-K stated that favorable sequential sales trends experienced by the Company in the fourth quarter of 2017 had continued into the first quarter of 2018. For example, the 2017 Form 10-K stated the following in pertinent part:

> Excluding the favorable net impact of estimated cigarette and heated tobacco unit inventory movements of approximately 3.3 billion units, our total shipment volume decreased by 3.1%. *The favorable inventory movements were driven primarily by approximately 8.5 billion units net in Japan reflecting: the increasing demand for HeatSticks, anticipated to further increase in the first quarter of 2018* following a planned lifting of the restriction on IQOS device sales; the establishment of appropriate distributor inventory levels of heated tobacco units, given the current high dependence on a single manufacturing center; and the transition from air freight to sea freight of heated tobacco units, largely completed in the fourth quarter of 2017.

Defendants Calantzopoulos and King signed the 2017 Form 10-K and certified that it was accurate, not misleading and free from fraud.

50.    On February 21, 2018, Defendants Calantzopoulos, King and Olczak presented on behalf of Philip Morris at the Consumer Analyst Group of New York Conference. In his prepared remarks, Defendant Calantzopoulos stated that the Company was "progressing" on various initiatives "to accelerate growth" in heated tobacco unit sales. Defendant Calantzopoulos later stated that Philip Morris should be considered a "*growth stock*," because "*8%-plus currency-neutral net revenue growth is not just a 2017 or 2018 phenomenon*" for the Company, but would likely continue into the future based on existing trends and initiatives in the business. According to Defendant Calantzopoulos, "*returns on our investment to accelerate consumer switching this year will mostly be realized next year*, further improving our year-over-year comparisons. So EPS results in 2019 are very likely to be better than those this year."

51.     As part of his prepared remarks, Defendant Olczak used Japan as an example to illustrate the purported success of the Company's sales initiatives for increased heated tobacco unit volumes. Specifically, Defendant Olczak highlighted the Company's purported success in converting Japan's existing adult population to heated tobacco products, stating: "As the understanding of the category and its benefits are established in adult smoker communities, *IQOS starts enjoying word of mouth as adult smokers share experiences with friends and peers.* Although this varies according to countries and cultures, it is universally true." He continued, stating that Philip Morris would go "deeper with IQOS into [its] existing launch markets," which included Japan, and that it planned "to further deploy [its] many learnings across these markets to accelerate growth."

52.     Defendant Olczak further stated that accelerating growth trends at the end of 2017 had continued into 2018. He stated the following in pertinent part:

> [W]e recorded sequential growth in our heated tobacco unit national market shares in 2017. *This growth trend continued in January of 2018*, with standout performances in Korea, Portugal and Romania. There was a similar growth trend in the focus area offtake shares for our markets that are more targeted geographically.
>
> *This strong growth continued in January. Our weekly offtake shares in Japan continued to grow in January, both nationally and in the prefectures where the heated tobacco category is the most mature from a competitive standpoint:* Fukuoka, Sendai and Tokyo. In Sendai specifically, our weekly offtake share growth in January drove further growth in our heated tobacco category share. In fact, the category's growth was driven primarily by IQOS.
>
> *Our strong share performances for IQOS continue to be underpinned by high IQOS switching across markets. This generally reflects rates of full and predominant conversion ranging from around 70% to 90%.* IQOS switching rates in certain markets are beginning to reflect the emerging presence of competition in the heated tobacco category as IQOS purchasers experiment with newly available products, even if just temporarily. The most obvious example is Japan, where there are now several heated tobacco products.

53.    The following slides were included with Defendants' presentation and purported to show that Philip Morris had rapidly expanded its heated tobacco unit sales in Japan and had continued to increase market share in the first quarter of 2018, in particular by converting adult smokers and because of the success of the Company's sales initiatives:





## IQOS: HeatSticks Offtake Share Growth Continues in Japan

Weekly Offtake Shares (%)

| | 2017 | | | 2018 | Variance |
| Week ending: | Jan-29 | Jul-2 | Dec-31 | Jan-28 | Jan-28 vs. Dec-31 |
|---|---|---|---|---|---|
| Fukuoka | 7.5 | 11.5 | 15.1 | 16.0 | +0.9pp |
| Sendai | 13.0 | 17.2 | 20.0 | 20.5 | +0.5pp |
| Tokyo | 9.5 | 14.9 | 17.7 | 18.6 | +0.9pp |
| National | 7.7 | 12.8 | 16.2 | 16.8 | +0.6pp |

Note: Offtake share represents select C-Store sales volume for HeatSticks as a percentage of the total retail sales volume for cigarettes and heated tobacco units
Source: PMI Financials or estimates                                                                                    45

54. The statements contained in ¶¶ 37-53 were materially false and/or misleading when made because Defendants failed to disclose that: (i) previously favorable sales growth trends experienced by the Company had not been sustained; (ii) the Company's sales initiatives designed to convert adult smokers in Japan to heated tobacco units had faltered, and the Company's near-term growth prospects in key Japanese markets had plateaued; (iii) new product sales initiatives and attempts to generate revenue through price increases would not be able to sustainably offset declining sales volumes in the Company's combustible products as had been represented to investors; and (iv) the Company's positive statements about its business, operations, and prospects lacked a reasonable basis.

55. Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." The failure of the 2017 Form 10-K to disclose the facts listed in ¶ 54 violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed facts

were known to Defendants and would (and did) have an unfavorable impact on the Company's

sales, revenue and income from continuing operations.

56.    On April 19, 2018, Philip Morris reported its financial results for the quarter

ended March 31, 2018 ("1Q18 Release"). The Company revealed that it had only achieved

cigarette and heated tobacco unit shipment volumes of 173.8 billion units, a decline of 2.3%.

This result was significantly worse than consensus estimates of a total volume decline of only

0.6%. Similarly, the Company's cigarette volumes declined 5.3%, despite being compared

against an 11.5% decline from the prior-year quarter. The Company's heated tobacco unit sales

fared particularly poorly, with quarterly sales of only 9.6 billion units compared to consensus

estimates of 13.2 billion units, which represented a sequential *decline* of nearly 39%.

57.    The 1Q18 Release further revealed that growth had slowed in the same key Japan

markets that had been highlighted by Defendants. In addition, the release revealed that the

Company was no longer positioned to achieve net revenue growth greater than 8%,

notwithstanding Defendant Calantzopoulos' statement more than halfway through the

disappointing quarter that this growth rate would be maintained for the foreseeable future. Later,

in connection with its second quarter 2018 results, Philip Morris revealed that it was only on

track to achieve 3% to 4% projected currency neutral net revenue growth for 2018.

58.    While the 1Q18 Release disclosed that the Company's sales initiatives were

having limited success in converting "'more conservative adult smoker segments,'" Defendants

further revealed the troubling extent of the problem on an earnings call held that same day. On

the call, Defendant King disclosed that the Company's sale of heated tobacco units in Japan had

hit a "plateau." Rather than being needed to meet growing demand as was represented to

investors, Defendant King stated that Philip Morris's increased shipments to Japan at the end of

2017 had come "close to saturating the early adopters and innovators," as sales initiatives had stalled throughout the quarter. Defendant King also revealed that the Company had achieved Japan market share for March of 15.6%, which implied that February – the same month during which Defendants had touted a "growing" Japan market share of "16.3%" – had been the ***worst month*** of the quarter.

59.    On this news, Philip Morris stock price fell $15.80 per share, or more than 15 percent, to close at $85.64 per share, on abnormally large trading volume of more than 45 million shares.

60.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

61.    During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

62.    The Individual Defendants permitted Philip Morris to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock.

63.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Philip Morris, their control over, receipt, and/or

modification of Philip Morris' allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Philip Morris, participated in the fraudulent scheme alleged herein.

64.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Philip Morris common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Philip Morris' business, operations, and management and the intrinsic value of Philip Morris common stock and caused Plaintiff and members of the Class to purchase Philip Morris common stock at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

65.     During the Class Period, as detailed herein, Philip Morris and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Philip Morris common stock, and operated as a fraud or deceit on Class Period purchasers of Philip Morris common stock by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Philip Morris common stock declined as the prior artificial inflation came out of the price over time. As a result of their purchases of Philip Morris common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

66.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff and other members of the Class purchased Philip Morris common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

67.    At all relevant times, the markets for Philip Morris common stock were efficient for the following reasons, among others:

(a)    as a regulated issuer, Philip Morris filed periodic public reports with the SEC;

(b)    Philip Morris regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    Philip Morris was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)    Philip Morris common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "PM."

68.    As a result of the foregoing, the market for Philip Morris common stock promptly digested current information regarding Philip Morris from publicly available sources and reflected such information in Philip Morris' stock price.    Under these circumstances, all purchasers of Philip Morris common stock during the Class Period suffered similar injury through their purchase of Philip Morris common stock at artificially inflated prices and the presumption of reliance applies.

69.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## NO SAFE HARBOR

70.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Philip Morris who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Philip Morris common stock between July 26, 2016 and April 18, 2018, inclusive (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Philip Morris, and the directors and officers of Philip Morris and their families and affiliates at all relevant times.

72.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of July 23, 2018, there were 1,554,506,845 shares outstanding of the registrant's common stock.

73.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Philip Morris common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

74.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

75.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT  I
### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

77.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Philip Morris common stock during the Class Period.

80.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Philip Morris common stock.  Plaintiff and the Class would not have purchased Philip Morris common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

81.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Philip Morris common stock during the Class Period.

### COUNT  II
### For Violation of Section 20(a) of the Exchange Act
### <u>Against the Individual Defendants</u>

82.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.    The Individual Defendants acted as controlling persons of Philip Morris within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Philip Morris, the Individual Defendants had the power and ability to control the actions of Philip Morris and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Federal Rule of Civil

Procedure 23;

B.      Awarding Plaintiff and the members of the Class damages and interest;

C.      Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  September 26, 2018                    **LABATON SUCHAROW LLP**

                                              */s/ Christopher J. Keller*
                                              Christopher J. Keller
                                              Eric J. Belfi
                                              Francis P. McConville
                                              140 Broadway
                                              New York, New York 10005
                                              Telephone: (212) 907-0700
                                              Facsimile: (212) 818-0477
                                              Emails: ckeller@labaton.com
                                                      ebelfi@labaton.com
                                                      fmcconville@labaton.com

                                              *Attorneys for Plaintiff Greater Pennsylvania*
                                              *Carpenters' Pension Fund*

# CERTIFICATION

I, James R. Klein, as Administrator of Greater Pennsylvania Carpenters' Pension Fund ("GPCPF"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of GPCPF. I have reviewed a complaint prepared against Philip Morris International Inc. ("Philip Morris"), alleging violations of the federal securities laws;

2.      GPCPF did not purchase securities of Philip Morris at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      GPCPF is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      GPCPF's transactions in Philip Morris securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      GPCPF sought to serve as a lead plaintiff in the following class actions under the federal securities laws filed during the last three years:

> *Ramirez v. Exxon Mobil Corporation*, No. 3:16-cv-03111 (N.D. Tex.)
> *In re Celadon Group, Inc. Securities Litigation*, No. 1:17-cv-2828 (S.D.N.Y.)
> *Bristol County Retirement System v. Telefonaktiebolaget LM Ericsson*, No. 1:18-cv-3021 (S.D.N.Y.)

6.      Beyond its pro rata share of any recovery, GPCPF will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 21st day of September, 2018.

James R. Klein
*Administrator*
*Greater Pennsylvania Carpenters' Pension Fund*

EXHIBIT A

## TRANSACTIONS IN PHILIP MORRIS INTERNATIONAL INC

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 01/25/18 | 10,135.00 | $107.58 | ($1,090,323.30) |